**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| PETER HAMILTON | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 13-4036 |
| v. | ) | |
| | ) | Judge Robert M. Dow, Jr. |
| CAROLYN W. COLVIN, Acting, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND OPINION

This matter is before the Court on Plaintiff Peter Hamilton's motion seeking review of the Commissioner of Social Security's decision to deny his application for supplemental security income [19]. Plaintiff asks the Court to reverse the decision of the Administrative Law Judge or to remand for further proceedings. For the reasons stated below, the Court grants Plaintiff's request and remands this case to the Administrative Law Judge for further proceedings consistent with this Opinion.

## I.     Procedural Background

Plaintiff applied for supplemental security income on April 17, 2009, alleging that he became disabled as of March 12, 2006. See Administrative Record ("AR") at 12. Plaintiff's claim was denied initially and upon reconsideration. Plaintiff requested a hearing, which took place on November 21, 2011 before an Administrative Law Judge ("ALJ"). In a decision dated December 12, 2011, the ALJ denied Plaintiff's claim. Plaintiff sought review of the ALJ's decision, and the Appeals Council denied his request, making the ALJ's decision the final decision of the Commissioner. AR at 1. Plaintiff now seeks judicial review of the final decision

of the Commissioner of Social Security. This Court has jurisdiction pursuant to 28 U.S.C. § 405(g).

II.     Facts

        A.      Background

        Plaintiff was born on October 18, 1966 and was forty-two on the filing date. AR at 19. He is able to communicate in English, and he has a high school education as well as past relevant work as a machine operator. *Id.* He alleges that poor health, discussed further below, caused him to stop working as a machine operator in approximately 2006. AR at 29, 137. He subsequently earned income through sporadic babysitting, but within a few years, his health allegedly prevented him from even doing that. AR at 29-30; see AR at 137.

        B.      Medical Evidence

        In June 2008, Plaintiff began treatment with his primary care physician, Laura Lucero, M.D. AR at 334. According to Dr. Lucero, Plaintiff suffers from chronic back pain, a herniated disk, rheumatoid arthritis, severe anemia, chronic pancreatitis, major depression, lupus, and insomnia. AR at 397. To address these illnesses and symptoms, Dr. Lucero has referred Plaintiff to various specialists since she began treating him.

        In 2009, Dr. Lucero referred Plaintiff to neurologist Ricardo Kohn, M.D., for leg cramps and weakness. AR at 330. When Dr. Kohn first evaluated Plaintiff in November 2009, he noted episodic leg cramping that occurred approximately five times a day for 30 minutes each time. *Id.* Plaintiff had difficulty walking and going up or down stairs because his legs felt weak. *Id.* He also complained of neck pain and tingling paresthesia below both elbows. *Id.* Plaintiff was suspected to have restless leg syndrome, for which he was receiving Requip with no improvement. *Id.* Plaintiff was unable to stand up from a chair without arm support, and Dr.

Kohn noted generalized weakness. AR at 331. He prescribed Neurontin for pain control. *Id.* As of September 2010, Dr. Kohn continued to note diagnoses of leg pain and muscle cramping due to mild peripheral neuropathy and undifferentiated connective tissue disease, among other diagnoses discussed further below. AR at 402.

To address Plaintiff's paresthesia, Dr. Kohn performed a nerve conduction study consistent with mild bilateral peroneal neuropathy affecting mostly the superficial peroneal nerves. AR at 403-4. He also ordered a cervical spine MRI. AR at 332. A previous cervical spine MRI from 2007 had shown degenerative disc disease with a large central disc protrusion at C5-C6. AR at 328. The cervical spine MRI ordered by Dr. Kohn showed spondylotic changes at C5-C6, a narrowing of the disc space at that level, a broad-based posterior disc osteophyte complex, broad-based disc protrusion, and mild effacement of the ventral thecal sac with overall mild central canal narrowing. AR at 472. Another MRI in February 2010 revealed mild to moderate degenerative disc disease at C5-C6 with spondylitic changes projecting anteriorly and posteriorly. AR at 285. This was associated with a diffuse bulging disc producing mild central canal stenosis. AR at 285-86.

In 2010, Dr. Lucero also referred Plaintiff to rheumatologist Daniel Torres, M.D., for musculoskeletal pain. AR at 467. When Dr. Torres first evaluated him in May 2010, Plaintiff's chief complaint was pain and swelling of his hands for about three months. *Id.* Dr. Torres treated him for undifferentiated connective tissue disease and soft tissue rheumatism, including back pain. AR at 446-68. According to Dr. Torres' final progress note in the record, dated March 18, 2011, Plaintiff was experiencing increased pain in his peripheral joints and had an antalgic gait secondary to right leg pain. AR at 446. Plaintiff was taking prednisone, Neurontin, and Cymbalta. *Id.*

In July 2011, Plaintiff began to receive orthopedic care from Steven Chandler, D.O. At the time, his chief complaint was pain in his left knee and right hand. AR at 637. Plaintiff's knee pain increased with kneeling, climbing, and squatting and improved with rest. AR at 637. Dr. Chandler diagnosed him with sprains of the right fourth and fifth CMC joints; a ligament tear in his right hand at the fourth and fifth MC heads; a sprain in his left knee; patellar chondromalacia in his left knee; internal derangement of medial meniscus; and rheumatoid arthritis. AR at 636. Dr. Chandler ordered anti-inflammatories and physical therapy. AR at 640.

During this period, Plaintiff also received treatment for anemia. In April 2009, he went to the emergency room at St. Bernard Hospital, complaining of left lower extremity swelling. AR at 243. His records there, consistent with other medical records in the administrative record, indicate two episodes of pulmonary embolism in the previous three years. AR at 230, 243, 257; see also AR at 299 ("The patient has a history of pulmonary embolism x2, first diagnosed 3 years ago treated with anticoagulation and on discontinuation of anticoagulation developed recurrent deep venous thrombosis the following year"). While at St. Bernard, Plaintiff was diagnosed with anemia and admitted for a transfusion. AR at 243. His subsequent treatment records at Hematology-Oncology Associates of Illinois indicate "profound iron deficiency anemia," see, *e.g.*, AR at 381, for which he received iron therapy, AR at 355-62.

In November 2009, Plaintiff also began treatment with David Manuel, M.D., for gastrointestinal problems. In December 2009, he was admitted to the emergency room, where he was diagnosed with pancreatitis. AR 278-81; see also AR at 296. In January 2010, he was again admitted to the hospital for symptoms of gallstone pancreatitis, including severe upper quadrant abdominal pain. AR at 299; 370. Plaintiff told his surgeon, Gerald Lynch, M.D., that

he had experienced chronic nausea and epigastric pain for over 6 months and that he had lost

about 8 lbs in the last month. *Id.* Dr. Lynch performed a laparoscopic cholecystectomy. AR at

370. In September 2010, Dr. Manuel referred Plaintiff to the University of Chicago's GI Unit,

where an upper endoscopic ultrasound similarly suggested chronic pancreatitis. AR at 610-11.

Plaintiff's indications at the time still included weight loss and nausea with vomiting. AR at 611.

Plaintiff's records from Lakeshore Gastroenterology indicate frequent vomiting, nausea, and

poor appetite continuing through 2011. See AR 508 (noting daily vomiting, at times with blood,

and an ability to keep down half of his intake); AR at 511-12 (noting an episode of

hematemesis); AR at 513 (noting poor appetite and nausea); AR at 523 ("He does have some

nausea pretty much all the time"); AR at 534 (EGD procedure report noting indications of recent

hematemesis).

As for Plaintiff's mental health throughout this period, Dr. Lucero's records indicate that

she treated him for depression, see generally AR at 333-48; 415-42, prescribing him Xanax,

Zoloft and Cymbalta, AR at 348, 417-21, 425. Her records from July 12, 2010 indicate that he

saw a psychiatrist, AR at 420-21, but the administrative record does not include any records from

a psychiatrist.

Lastly, the administrative record provides multiple assessments of Plaintiff's functional

limitations. In September 2010, state agency medical consultant M.S. Patil, M.D., evaluated him

for 35 minutes. AR at 380. Among other things, Dr. Patil noted normal hand dexterity, no

swelling or tenderness of any joint, a normal gait, and a motor strength of 5/5 in all upper and

lower extremities. AR at 382.

In November 2010, state agency medical consultant Reynaldo Gotanco, M.D., opined

that Plaintiff could do light work. See AR at 383-90. He found that Plaintiff could occasionally

lift 20 lbs; frequently lift 10 lbs; and stand, sit, or walk for about 6 hours a day.  AR at 384.  He

found no limitations with respect to pushing or pulling, *id.*; no postural limitations, AR at 385;

and no manipulative limitations, AR at 386.

In December 2010, Dr. Manuel opined that Plaintiff's chronic pancreatitis caused

recurrent nausea/vomiting, persistent abdominal pain, poor appetite with weight loss, emesis,

recurring dizzy spells, weakness, chronic fatigue and radiation of abdominal pain to the back.

AR at 394.  He opined that Plaintiff could never lift more than 10 lbs and that he would be off

task at least 15% of the time.  AR at 394, 396.  He opined that Plaintiff would be unable to

perform routine repetitive tasks at consistent pace; detailed or complicated tasks; or fast-paced

tasks.  AR at 395.  He further stated that Plaintiff can only walk one block without rest or severe

pain and that Plaintiff can sit as well as stand/walk for only two hours total in an eight hour work

day.  AR at 395.

Also in December 2010, Dr. Lucero opined that Plaintiff could sit for ten minutes at a

time, stand for ten minutes at a time, and stand/walk for about two hours total in an eight-hour

workday.  AR at 398.  He required a job permitting him to walk every 10 minutes for

approximately five minutes each time.  AR 398-99.  She also stated that he required use of a

cane.  AR at 399.  He could not lift more than 10 lbs or twist, stoop, crouch, or climb.  *Id.*  She

stated that emotional factors contributed to the severity of his symptoms and functional

limitations, AR at 397; that he was likely to be off task at least 25% of the day, AR at 400; and

that he was incapable of even low stress work, *id.*

### C.     The Hearing

At the hearing on November 21, 2011, Plaintiff testified that he continued vomiting with

almost every meal.  AR at 33-34.  He stated that he also vomited between meals, sometimes in

public and without warning. AR at 34-35. He stated that lifting aggravated his abdominal pain, starting at about 5 lbs. AR at 39.

In testifying about his knee pain, Plaintiff stated that he used a cane, which his doctor had given him six months earlier following knee injections. AR at 30. He stated that he had stopped going up the stairs in his house for approximately a year due to knee pain, AR at 31, and that he kept his leg stretched out and elevated to keep the swelling down, AR at 35. Plaintiff further testified that arthritis caused pain in his hands, preventing him from buttoning up buttons, taking his clothes on and off, opening jar lids, making a grip, cutting food or using utensils. AR at 32; 36-38. He stated that he experienced tingling in his legs, feet, and neck. AR at 38-39. Lastly, he stated that he generally stayed to himself, frequently felt exhausted, and slept excessively. AR at 40.

The vocational expert then testified in response to various hypotheticals posed by the ALJ and Plaintiff's counsel. Most relevant here, she testified that someone who could (i) lift and carry 20 lbs occasionally and 10 lbs frequently and (ii) stand and sit six hours in an eight-hour workday—light exertional work—could not perform Plaintiff's past relevant work but could perform other work in the national or regional economy. AR at 42. She testified that someone with Plaintiff's age, education, and work experience who was limited to light exertional work, occasional fingering with the dominant hand, and occasional interactions with the public, however, could not find work in the national or regional economy. AR at 44. She also testified that if a person needs a cane, he is limited to sedentary work, and that someone with Plaintiff's age, education, and work experience who was limited to sedentary work and occasional handling/fingering in the dominant hand could not find work. AR at 45. She also testified that

someone with Plaintiff's background who was limited to light work and off task 15% of the time could not find work.  AR at 47.

## III.      Disability Standard

To be eligible for disability benefits, a claimant must establish that he suffers from a "disability" as defined by the Social Security Act and regulations.  The Act defines "disability" as an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than twelve months.  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). To be found disabled, the claimant's impairment must not only prevent him from doing previous work, but, considering his age, education, and work experience, it also must prevent him from engaging in any other type of substantial gainful activity that exists in significant numbers in the economy.  42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B); 20 C.F.R. 404.1520(e)-(f), 416.920(e)-(f).

Social Security regulations enumerate a five-step inquiry to evaluate whether the claimant is entitled to disability insurance benefits.  20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). At Step 1, the ALJ determines whether the claimant is engaged in substantial gainful activity.  If so, the claimant is not disabled, and the claim is denied.  If not, the inquiry proceeds to the next step.  At Step 2, the ALJ determines whether the claimant has an impairment or combination of impairments that are severe.  If not, the claimant is not disabled, and the claim is denied.  If so, the inquiry proceeds to the next step.  At Step 3, the ALJ determines whether the impairment(s) meet or equal a listed impairment in the appendix to the regulations.  If so, the claimant is automatically considered disabled.  If not, the inquiry proceeds to the next step.  At Step 4, the ALJ determines whether the claimant can do past relevant work.  If so, the claimant is not

disabled, and the claim is denied. If not, the inquiry proceeds to the next step. At Step 5, the ALJ determines whether the claimant can perform other work, given his residual functional capacity ("RFC"), age, education, and experience. If so, then the claimant is not disabled, and the claim is denied. If not, then the claimant is disabled. 20 C.F.R. §§ 404.1520(a)(4)(i)-(v), 416.920(a)(4)(i)-(v); see also *Scheck v. Barnhart*, 357 F.3d 697, 699–700 (7th Cir. 2004).

At the fourth and fifth steps, the ALJ must consider an assessment of the claimant's residual functional capacity ("RFC"). "The RFC is an assessment of what work-related activities the claimant can perform despite her limitations." *Young*, 362 F.3d at 1000. The ALJ must assess the RFC based on all the relevant evidence of record. *Id.* at 1001 (citation omitted). The claimant bears the burden of proving steps one through four, whereas the burden at step five is on the ALJ. *Id.* at 1000; see also *Zurawski*, 245 F.3d at 886; *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995).

## IV. The ALJ's Opinion

The ALJ made the following findings:

1. The claimant has not engaged in substantial gainful activity since April 17, 2009, the application date (20 CFR 416.971 *et seq.*).

2. The claimant has the following severe impairments: degenerative disc disease, cervical; anemia; pancreatitis; undifferentiated connective tissue diseases; and soft tissue rheumatism (20 CFR 416.920(c)).

3. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925 and 416.926).

4. The claimant has the residual functional capacity to perform the full range of light work as defined in 20 CFR 416.967(b).

5. The claimant is unable to perform any past relevant work (20 CFR 416.965).

6. The claimant was born on October 18, 1966 and was 42 years old, which is defined as a younger individual age 18-49, on the date the application was filed (20 CFR 416.963).

7. The claimant has at least a high school education and is able to communicate in English (20 CFR 416.964).

8. Transferability of job skills is not material to the determination of disability because applying the Medical-Vocational Rules directly supports a finding of "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

9. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR416.969 and 416.969(a)).

10. The claimant has not been under a disability, as defined in the Social Security Act, since April 17, 2009, the date the application was filed (20 CFR 416.920(g)).

AR at 14-19.

At Step 2, the ALJ found that Plaintiff has depression but that it is not severe. In arriving at this conclusion, she analyzed the four functional areas in 12.00C of the Listing of Impairments, also known as the "paragraph B" criteria: (i) activities of daily living, (ii) social functioning, (iii) concentration, persistence or pace, and (iv) episodes of decompensation. See AR at 14; 20 C.F.R. § 404.1520a(c)(3). She found that Plaintiff's depression was non-severe because it caused no more than "mild" limitations in any of the first three criteria and no episodes of decompensation. In determining the first three criteria, she relied exclusively on Plaintiff's testimony, noting that Plaintiff stated that he had seen a psychiatrist but that the record lacked any documentation from a psychiatrist. AR at 14-15.

In determining that Plaintiff was capable of light work at Step 4, the ALJ stated, "I find that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent that they are inconsistent

with . . . the evidence." AR at 16. She later explained that his testimony contradicted Dr. Patil's report specifically:

> The claimant's allegations are not supported by the medical evidence. He testified to various limitations such as problems grooming and brushing his teeth. There are no examinations in the record to support these allegations. In September 2010, he had motor strength of 5/5 in all upper and lower extremities. There were no limitations of range of motion in the spine and back. The claimant had a normal gait and had a full range of motion of all the joints. His fine and gross manipulative movements of hands and fingers were within normal limits. He could make no grips and oppose thumbs (Ex. 12F). As such, I do not find the claimant's allegations fully credible.

AR at 18.

As for the remaining opinion evidence, the ALJ gave Dr. Lucero's opinion little weight, explaining only that "[t]he medical evidence, including Dr. Lucero's own treatment notes, do not support such extreme limitations. (Ex.'s 12F, 9F, 18F)." AR at 18. As for Dr. Manuel's opinion, she stated, "I give this opinion little weight, as again, these extreme limitations are not supported by the medical evidence (Ex. 12F). The claimant's activities also do not support these limitations." AR at 18. The ALJ gave Dr. Gotanco's opinion from November 2010 great weight, stating that it was "supported by the record" without adding further explanation. *Id.*

V.    **Standard of Review**

The Social Security Act authorizes judicial review of the final decision of the SSA and indicates that the Commissioner's factual findings must be accepted as conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Thus, a court reviewing the findings of an ALJ will reverse the findings of the Commissioner "only if they are not supported by substantial evidence or if they are the result of an error of law." *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Pepper v. Colvin*, 712 F.3d 351, 361-62 (7th Cir. 2013) (quoting *Richardson v. Perales*, 402 U.S. 389, 40 (1971)). A court reviews the entire

administrative record, but does not "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute our own judgment for that of the Commissioner." *McKinzey v. Astrue*, 641 F.3d 884, 889 (7th Cir. 2011) (citation omitted). In other words, the question upon judicial review is not whether the claimant is, in fact, disabled; even if reasonable minds could differ concerning disability, a reviewing court will affirm so long as the ALJ applied the correct legal standard and substantial evidence supported the decision. See *Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012).

An ALJ must build "an accurate and logical bridge" from the evidence to her conclusion. *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008) (citation omitted)). "If a decision 'lacks evidentiary support or is so poorly articulated as to prevent meaningful review,' a remand is required. *Kastner v. Astrue*, 697 F.3d 642, 646 (7th Cir. 2012) (quoting *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002)). "Although an ALJ need not mention every snippet of evidence in the record, the ALJ must connect the evidence to the conclusion; in so doing, he may not ignore entire lines of contrary evidence." *Arnett v. Astrue*, 676 F.3d 586, 592 (7th Cir. 2012)

## VI.    Analysis

Plaintiff moves for reversal, arguing that the ALJ erred in (1) accounting for Plaintiff's mental impairments; (2) weighing the physicians' opinions; (3) insufficiently accounting for fatigue and vomiting in the RFC; (4) evaluating Plaintiff's credibility. The Court considers each argument in turn.

### A.    Mental Impairment

Plaintiff argues that the ALJ improperly determined the functional limitations of his depression. In addressing the severity of Plaintiff's depression, the ALJ determined his limitations with respect to the four broad functional areas set out in 12.00C of the Listing of

Impairments, also known as the paragraph B criteria. See 20 C.F.R. § 404.1520a(c)(3). Her conclusions were based entirely on her independent analysis of his testimony and his Activities of Daily Living form, which was approximately two and a half years old at that time. AR at 14-15. She did not root her analysis in an expert opinion.

The Seventh Circuit has cautioned ALJs against determining the paragraph B limitations in the absence of an expert opinion. There is no "absolute requirement" that an ALJ rely on an expert assessment in determining a claimant's paragraph B limitations. *Richards v. Astrue*, 370 F. App'x 727, 731 (7th Cir. 2010). Nevertheless, the Seventh Circuit has remanded where an ALJ's paragraph B determination lacked expert foundation and where "the need for additional evidence about the limiting effects of [the claimant's] depression and anxiety was apparent" from the record. *Richards*, 370 F. App'x at 731. In *Richards*, the Seventh Circuit found an apparent need for additional evidence because the claimant's psychiatrist had diagnosed and treated the claimant for depression without opining on how his mental impairments affected his functional capacity. *Id.* The court noted that, although the claimant ultimately bears the burden of proving disability, "an ALJ may not draw conclusions based on an undeveloped record and 'has a duty to solicit additional information to flesh out an opinion for which the medical support is not readily discernable.'" *Id.* (quoting *Barnett v. Barnhart,* 381 F.3d 664, 669 (7th Cir. 2004)).

Here, the ALJ found that Plaintiff had only mild limitations under the first three paragraph B limitations. As in *Richards*, she arrived at these conclusions in the absence of an expert opinion, relying instead on her own analysis of Plaintiff's alleged symptoms and activities. Her analysis was problematic in several respects. First, the need for further evidence was apparent because Dr. Lucero, who treated Plaintiff for depression, may well have offered a partial opinion as to Plaintiff's paragraph B limitations. Dr. Lucero opined that emotional factors

contributed to the severity of Plaintiff's symptoms and functional limitations, AR at 397; that he

was likely to be off task at least 25% of the day, AR at 400; and that he was incapable of even

low stress work, *id.* It is unclear how much she attributed these limitations to Plaintiff's

depression, specifically. To the extent that Dr. Lucero did attribute these limitations to

depression, she only addressed the third paragraph B criterion: concentration, persistence or

pace. In other words, Dr. Lucero's opinion was ambiguous and incomplete insofar as it

addressed the paragraph B limitations, but to the extent that it did, it likely weighed in favor of

finding more than a mild limitation. Accordingly, further information was necessary to clarify

and supplement her opinion, yet the ALJ did not solicit anything more either from Dr. Lucero or

Plaintiff's counsel. More puzzling, the ALJ overlooked Dr. Lucero's opinion in analyzing the

paragraph B limitations, a dubious choice given that it likely weighed in Plaintiff's favor. See

*Terry v. Astrue*, 580 F.3d 471, 477 (7th Cir. 2009) ("Although an ALJ need not discuss every

piece of evidence in the record, the ALJ may not ignore an entire line of evidence that is contrary

to the ruling."). Second, there also was an apparent need for further evidence because Dr.

Lucero's records indicate that Plaintiff saw a psychiatrist, but there are no psychiatric records in

the administrative record. The ALJ acknowledged these facts in her opinion, but she did not

inquire further into Plaintiff's psychiatric treatment. Nor did the ALJ solicit a consultative

examination. Instead, she arrived at her own independent medical conclusion based on the

Plaintiff's allegations. In ignoring the available evidence, in declining to solicit further expert

analysis, and in determining Plaintiff's paragraph B limitations herself, the ALJ failed to support

her opinion with substantial evidence. This error was not harmless, particularly in combination

with the errors explained below.[1]

---

[1] The harmless error rule applies to administrative proceedings. *Sanchez v. Barnhart*, 467 F.3d 1081, 1082-83 (7th Cir. 2006) ("[I]n administrative as in judicial proceedings, errors if harmless do not require

As the Commissioner notes, Plaintiff's counsel could have solicited an expert opinion as to Plaintiff's paragraph B limitations himself, but he did not. When counsel claims a mental impairment, it is advisable to solicit a comprehensive expert opinion directly addressing the paragraph B criteria; the burden, after all, is on the applicant to prove disability, and ALJs are busy people. See *Richards*, 370 F. App'x at 731. Nevertheless, counsel's failure to provide a doctor's report does not permit an ALJ to assume the role of a doctor. And, contrary to the Commissioner's contention, nothing in *Richards* limits its holding to *pro se* cases.

**B.     Weighing The Physicians' Opinions**

Plaintiff argues that the ALJ erred in assigning little weight to the two treating physicians' opinions. A treating physician's opinion is entitled to controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 416.927(c)(2); see *Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010). "More weight is given to the opinion of treating physicians because of their greater familiarity with the claimant's conditions and circumstances." *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003). Accordingly, an ALJ "must offer 'good reasons' for discounting a treating physician's opinion." *Campbell*, 627 F.3d at 306 (quoting 20 C.F.R. § 404.1527(d)(2), which parallels 20 C.F.R. § 416.927(c)(2)). When a treating physician and a non-treating physician have different opinions, "it is up to the ALJ to decide which doctor to believe—the treating physician who has experience and knowledge of the case, but may be biased, or * * * the consulting physician, who may bring expertise and knowledge of similar cases—subject only to the requirement that the ALJ's decision be supported by substantial evidence." *Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996). Should an ALJ decline to give controlling weight to a treating physician's opinion, she must determine

(or indeed permit) the reviewing court to upset the agency's decision.").

what weight to assign it by considering "the length, nature, and extent of the treatment relationship; frequency of examination; the physician's specialty; the types of tests performed; and the consistency and support for the physician's opinion." *Larson*, 615 F.3d at 751; see also 20 C.F.R. § 416.927(c)(2). The Seventh Circuit has repeatedly criticized decisions that "said nothing regarding this required checklist of factors." *Larson v. Astrue*, 615 F.3d at 751; *Campbell*, 627 F.3d at 308. See also *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009); *Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008).

The ALJ gave little weight to both treating physicians' opinions without explicitly addressing the checklist of factors. With regard to the final factor, the ALJ did assert that both physicians' opinions were inconsistent with their own treatment records. However, she did not point to any particular inconsistencies. She generally cited entire exhibits, explaining tersely that "[t]he medical evidence, including Dr. Lucero's own treatment notes, do not support such extreme limitations. (Ex.'s 12F, 9F, 18F)," and, "I give [Dr. Manuel's] opinion little weight, as again, these extreme limitations are not supported by the medical evidence (Ex. 12F). The claimant's activities also do not support these limitations." AR at 18. These terse explanations do not build "an accurate and logical bridge" from the evidence to her conclusion, *Craft*, 539 F.3d at 673, and they effectively prevent meaningful review, *Kastner*, 697 F.3d at 646.

In fact, the ALJ's explanations in some respects appear to be contrary to the record, which does support the treating physicians' opinions. In December 2010, Dr. Lucero opined that Plaintiff could sit for ten minutes at a time, stand for ten minutes at a time, stand/walk for about two hours total in an eight-hour workday, or climb. AR at 398-99. She further opined that he needed to walk every ten minutes or so and that he required use of a cane. Dr. Khon's records from 2009 and 2010 offer support for these assessments. In describing symptoms of restless leg

syndrome, mild peripheral neuropathy, and undifferentiated connective tissue disease, they state that Plaintiff suffered from episodic leg cramping that occurred approximately five times a day for 30 minutes each time, AR at 330; that he had difficulty walking and going up or down stairs because his legs felt weak, *id.*; that he was unable to stand up from a chair without arm support; that he had neck pain; and that he was receiving Requip with no improvement. AR at 330-31. Dr. Torres's notes, which Dr. Lucero cites in her opinion, also indicate lower back pain, AR at 457, pain in his peripheral joints, and, eventually, an antalgic gait secondary to right leg pain. AR at 446. Plaintiff's MRIs from this period also indicated degenerative disc disease. See AR at 285, 328, 332, 472. Needless to say, Plaintiff's chronic pain and nausea associated with pancreatitis alone could also contribute to some of these limitations. See AR at 278-81, 299, 370, 610-11, 508, 511-12, 513, 523, 534.

Turning to Dr. Lucero's assessment that Plaintiff was likely to be off task at least 25% of the day and that he was incapable of low stress work, the Court is aware of nothing in the record that contradicts her opinion. To the extent that Dr. Lucero's opinion is derived from Plaintiff's depression, the record indicates that Dr. Lucero may well be the only physician who treated or even evaluated Plaintiff's mental health. Assuming so, she may well be in the best position to opine on these limitations. To the extent her opinion is rooted in physical pain, Dr. Manuel's records of chronic pain and nausea associated with pancreatitis support her assessment.

In support of the ALJ's argument that Dr. Lucero's opinion contradicts her own records, the Commissioner cites Dr. Lucero's treatment notes stating that Plaintiff's blood was drawn and that he had "no further complaints." Commissioner's Resp. at 4. Read in isolation, "no further complaints" arguably supports the ALJ's point. Read in light of Lucero's decision to refer Plaintiff to various specialists, and read in light of those specialists' records, the statements cited

by the Commissioner do not lend meaningful support to the ALJ's conclusion. "No further complaints" is a relative, subjective phrase, the meaning of which can vary significantly patient to patient. More useful are the hundreds of pages of medical records from Dr. Lucero and the specialists that offer objective evidence to the contrary.

The Commissioner's strongest argument points to the ALJ's citation of Dr. Patil's evaluation, conducted in September 2010. But even this argument is not persuasive. First, Dr. Patil's evaluation may contradict Dr. Lucero's assessment, but to the extent that it does, "it is up to the ALJ to decide which doctor to believe—the treating physician who has experience and knowledge of the case, but may be biased, or ... the consulting physician, who may bring expertise and knowledge of similar cases—*subject only to the requirement that the ALJ's decision be supported by substantial evidence*." *Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996) (emphasis added). In other words, the ALJ was required to explain how she resolved the conflict, creating a logical bridge between the evidence and the conclusion. This explanation is missing from the record. Instead, the ALJ cited the entirety of Dr. Patil's report, providing no explanation as to what specifically in Dr. Lucero's opinion and Dr. Patil's report contradicted each other and why she chose to discount Dr. Lucero's opinion. Second, Dr. Patil's thirty-five-minute evaluation conflicts with other contemporaneous evidence of Plaintiff's general condition during this overall period. For example, Dr. Patil stated that Plaintiff denied abdominal pain, nausea, vomiting, GI bleeding or significant weight loss. AR at 380. But only four days earlier, Plaintiff had undergone an Upper EUS at the University of Chicago, and the indications on the procedure report listed "established chronic pancreatitis, suspected chronic pancreatitis, abdominal pain, weight loss, diagnostic procedure, nausea with vomiting." AR at 610-611. Just

a few months before that, Plaintiff had undergone an emergency laparoscopic cholecystectomy. AR at 370.

Had the ALJ addressed the remaining factors on the checklist, she may have also decided to give Dr. Lucero's opinion greater weight. In particular, the first factor—the length, nature and extent of treatment—may warrant greater weight. Dr. Lucero has offered the longest, most consistent treatment of any physician in the record. More specifically, the record includes treatment records from Dr. Lucero stretching from June 2008 to May 2011. As Plaintiff's primary care physician, she has played an important role in bridging his care across various specialists. Given her unique role among the physicians in the record, the summary dismissal of her opinion is unsupported and may be unwarranted. The second factor—frequency of examination—also counsels in favor of greater weight. With some exceptions, Plaintiff generally saw Dr. Lucero at least once a month. See AR at 333-48, 416-26.

The record also provides support for Dr. Manuel's opinion, which also runs contrary to the ALJ's conclusion. In December 2010, Dr. Manuel opined that Plaintiff's chronic pancreatitis caused recurrent nausea/vomiting, persistent abdominal pain, poor appetite with weight loss, emesis, recurring dizzy spells, weakness, chronic fatigue and radiation of abdominal pain to the back. AR at 394. His opinion is consistent with the records, which indicate a visit to the ER in December 2009 for pancreatitis, AR 278-81; another visit to the ER in January 2010 for gallstone pancreatitis, see AR at 299, 370; chronic nausea and epigastric pain for the previous 6 months as well as weight loss, *id.*; a laparoscopic cholecystectomy, AR at 370; and continuing and consistent complaints of frequent vomiting (sometimes hematemesis), nausea, and poor appetite continuing through May 2011, see AR at 611, 608, 511-12, 513, 523, 534. These symptoms of nausea and vomiting are consistent with Dr. Manuel's opinion that Plaintiff would

be unable to perform routine repetitive tasks at a consistent pace; detailed or complicated tasks; or fast-paced tasks. AR at 395. They are also consistent with his opinion that Plaintiff could only walk one block without rest or severe pain and that Plaintiff cannot sit, stand or walk for about two hours. AR at 395. Moreover, Dr. Manuel's opinion that Plaintiff could never lift more than 10 lbs and that he would be off task at least 15% of the time, AR at 394, 396, is relatively consistent with Dr. Lucero's opinion that he was likely to be off task at least 25% of the day and was incapable of even low stress work, AR at 400. In fact, the two opinions are broadly consistent with each other in that they both describe serious limitations preventing light work. Lastly, Dr. Manuel's opinions are consistent with Plaintiff's testimony. See AR at 33 ("I'm throwing up constantly, still. It's just horrible. This is horrible."); AR at 34-35 (stating, for example, that he last vomited publicly while in the waiting room at the doctor's office and that he only reached a garbage can in time because someone brought it to him); AR at 39 (stating that lifting aggravates his abdominal pain, starting at about 5 lbs).

In discounting Dr. Manuel's opinion, the ALJ stated simply, "these extreme limitations are not supported by the medical evidence" and cited Dr. Patil's evaluation. Again, Dr. Patil's statement that "Plaintiff denied any abdominal pain, nausea, vomiting, GI bleeding or significant weight loss," AR at 380, is questionable because Dr. Manuel and Dr. Chennat at the University of Chicago's GI Unit both agreed that an Upper EUS needed to be performed only days earlier given indications of "established chronic pancreatitis, suspected chronic pancreatitis, abdominal pain, weight loss, diagnostic procedure, nausea with vomiting." AR at 611. Given that these treating physicians were specialized gastroenterologists, the ALJ's decision to dismiss their opinion on the basis of Dr. Patil's thirty-five minute evaluation at least called for further explanation.

The ALJ also discounted Dr. Manuel's opinion because "[t]he claimant's activities also do not support these limitations." AR at 18. She cited no activities and provided no further explanation. In fact, the Plaintiff's testimony about his daily activities does support these limitations. See AR at 30 (explaining that he could not even babysit anymore because "I'm very exhausted. It takes me a while to do a lot of things. It's hard for me to get up in the morning. I just need help doing a lot of simple things that I used to do. It's hard, also, for me to walk a distance."); AR at 33 ("I'm throwing up constantly, still. It's just horrible. This is horrible."); AR at 39 (stating that lifting aggravates his abdominal pain, starting at about 5 lbs); AR at 36-37 (stating that he needed help bathing and grooming, that he could no longer groom his hair and that he had difficulty shaving or brushing his teeth).

Had the ALJ addressed factors on the checklist other than consistency, she may have found further reason to give Dr. Manuel's opinion greater weight. In terms of the first factor—length, nature, and extent of the treatment relationship—Dr. Manuel began treating Plaintiff in 2009. AR at 394. In terms of the second factor—frequency of examination—he and other physicians at his office saw Plaintiff over fifteen times between November 2009 and June 2011. See AR 508-623. In terms of the third factor—type of tests performed—Dr. Manuel or a gastroenterologist working with him performed various EGDs, EUSs, colonoscopies, and lab work in addition to clinical exams over the same time period. See *id.*

Because the ALJ failed to address the checklist, the application of which supports a finding of greater weight, the Court remands for further proceedings that explicitly apply the checklist of factors and address the evidence as instructed.[2]

---

[2] In arguing that the ALJ improperly weighed the physicians' opinions, Plaintiff also contends that she erred in assigning Dr. Gotanco's opinion great weight. Plaintiff specifically argues that the ALJ should have given Dr. Gotanco's opinion less weight because significant evidence—Dr. Chandler's records in particular—were subsequently added to the record. The problem with Plaintiff's argument is that the

C.      **Failure to Account for Fatigue or Vomiting**

The ALJ additionally erred in failing to consider evidence of vomiting. It is well-established that "[a]lthough an ALJ need not discuss every piece of evidence in the record, the ALJ may not ignore an entire line of evidence that is contrary to the ruling." *Terry*, 580 F.3d at 477. See also *Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003); *Zurawski v. Halter*, 245 F.3d 881, 888 (7th Cir. 2001).

The ALJ's RFC analysis, which concluded that Plaintiff is capable of light work, ignored the entire line of evidence showing that he continues to vomit frequently. The ALJ did summarize Plaintiff's testimony, including his statements about frequent vomiting but then dropped these symptoms in her analysis. If anything, she suggested that there were no such symptoms within months of his surgery in 2010; immediately after noting the surgery, she stated,"[i]n March 2010, the claimant report (sic) feeling okay with his energy level being much better (Ex. 10F/9). In May 2010, he reported feeling stronger every day and attending physical therapy (Ex. 10F/7)." AR at 17. To the extent that the ALJ concluded that Plaintiff's symptoms subsided within months on the basis of these reports, there are two problems with her analysis. First, she cited records from a hematologist, not Plaintiff's gastroenterologists. At the time, the hematologist was treating Plaintiff somewhat successfully for anemia, so records of improvement may reflect the state of his anemia-related symptoms more than his pancreatic-related symptoms. Second, and most importantly, the ALJ ignored an entire line of evidence from Plaintiff's gastroenterologists. Their records reflect that, around September 2010 through at least May 2011, Plaintiff suffered from nausea and vomiting, including hematemesis. See AR 508 (noting daily vomiting, at times with blood, and an ability to keep down half of his intake);

<hr />

same evidence was added to the record after Drs. Lucero and Manuel provided their opinions. In other words, this argument does not persuasively explain why an ALJ should give more weight to the opinions of Drs. Lucero and Manuel than that of Dr. Gotanco.

AR at 511-12 (noting an episode of hematemesis); AR at 513 (noting poor appetite and nausea); AR at 523 ("He does have some nausea pretty much all the time"); AR at 534 (EGD procedure report noting indications of recent hematemesis). The ALJ failed to account for this evidence, which may critically affect his RFC. The Court accordingly remands for further proceedings that fully address the effect of nausea, vomiting, and associated fatigue on his RFC.

### D. Credibility Evaluation

Plaintiff argues that the ALJ erred in her credibility evaluation. The Court gives "considerable deference" to an ALJ's credibility finding and only overturns it if "patently wrong." *Terry*, 580 F.3d at 477 (citing *Prochaska v. Barnhart,* 454 F.3d 731, 738 (7th Cir. 2006)). Even so, the ALJ must consider the claimant's level of pain, medication, treatment, daily activities, and limitations. *Id.*; 20 C.F.R. § 416.929(c)(3); SSR 96-7p. She must also "justify the credibility finding with specific reasons supported by the record." *Terry*, 580 F.3d at 477 (citing *Villano v. Astrue*, 556 F.3d 558, 562 (7th Cir. 2009)). And she must still "build an accurate and logical bridge between the evidence and the result." *Ribaudo v. Barnhart*, 458 F.3d 580, 584 (7th Cir. 2006).

The ALJ found that Plaintiff's statements concerning the intensity, persistence and limiting effects of his symptoms were not credible because they were inconsistent with Dr. Patil's report. Her explanation fails to satisfy the standard above for several reasons. First, she selected only two of his alleged limitations—problems grooming and brushing his teeth—and highlighted parts of Dr. Patil's report that contradicted them. See AR at 18. She did not explain why his testimony about his other limitations lacked credibility. Particularly concerning, she did not address how his testimony about frequent vomiting and exhaustion bore on his credibility. Second, in rebutting the selected limitations, she used Dr. Patil's report. Dr. Patil may indeed

paint a healthier picture of Plaintiff than Plaintiff himself did in his testimony. But even so, the ALJ was required resolve the conflict between Dr. Patil and treating physicians Drs. Lucero and Manuel; the defect in the ALJ's process of weighing the physicians' opinions taints her credibility evaluation here.

Finally, the ALJ failed to note the "type, dosage, effectiveness, and side effects of any medication" or how those factors affected Plaintiff's credibility. 20 C.F.R. § 416.929(c)(3)(iv); SSR 96-7p. In response, the Commissioner argues that Plaintiff points to no side effects or limitations arising from the mere prescription of medication. The Commissioner's argument is somewhat beside the point. Plaintiff's numerous prescriptions—including Coumadin, Neurontin, Deltasone, Plaquenil, Prevacid, Cymbalta, Xanax, Creon, Ambien, Efexor, Hydrocodon-Acetaminophin, Celebrex, and Reglan—make his claims as to the symptoms and limitations caused by his impairments more credible, even assuming no side effects. For this reason, 20 C.F.R. § 416.929(c)(3)(iv) and SSR 96-7p require an ALJ to consider not only side effects but also the "type, dosage, effectiveness" of a medication. Moreover, a plaintiff's failure to identify side effects does not mean he lacks credibility; "not everyone experiences side effects from a given medication, and some patients may not complain because the benefits of a particular drug outweigh its side effects." *Terry*, 580 F.3d at 477. On remand, the agency should reassess Plaintiff's credibility in light of all of his testimony, all of the evidence of record, and all of the required considerations relating to medications.[3]

---

[3] Lastly, Plaintiff argues that the ALJ cherry picked information from his Activities of Daily Living form and testimony to find a mild limitation in the "activities of daily living" prong of the paragraph B analysis. See AR at 14. He further argues that an ALJ may not equate daily activities to the demands of competitive work. This argument, which blurs the impairment analysis and the RFC analysis, does not create grounds to attack the ALJ's credibility evaluation. In assessing the paragraph B analysis, the ALJ accepted the allegations the she highlighted as true. As previously stated, the ALJ did appear to overlook some of Plaintiff's more important statements—for example, ignoring his testimony about vomiting, and

**VII.    Conclusion**

For the reasons stated above, the Court grants Plaintiff's motion [19] and remands the case for further proceedings consistent with this Opinion.

Dated:  February 9, 2015

_____
Robert M. Dow, Jr.
United States District Judge

---

she improperly analyzed the paragraph B criteria in the absence of any medical testimony.  However, none of this bears on the ALJ's credibility evaluation.